[Cite as *State v. Smith*, 2014-Ohio-3034.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 100501

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## CHRISTOPHER SMITH

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-570702

**BEFORE:** Celebrezze, P.J., E.A. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** July 10, 2014

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Kevin R. Filiatraut
Assistant Prosecuting Attorney
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., P.J.:

{¶1} Defendant-appellant, Christopher Smith, appeals from his convictions for rape and gross sexual imposition following a jury trial. Appellant further appeals from the judgment of the common pleas court denying his motion for dismissal for preindictment delay. For the reasons stated herein, we affirm appellant's convictions and the judgment of the trial court.

## I. Factual and Procedural History

{¶2} On February 5, 2013, the Cuyahoga County Grand Jury returned an indictment against appellant charging him with rape in violation of R.C. 2907.02(A)(2), gross sexual imposition in violation of R.C. 2907.05(A)(1); kidnapping in violation of R.C. 2905.01(A)(4), with a sexual motivation specification; and kidnapping in violation of R.C. 2905.01(A)(3), with a sexual motivation specification. Each count included sexually violent predator specifications.

{¶3} On February 27, 2013, defense counsel filed a motion to dismiss based on preindictment delay. On April 25, 2013, a hearing was held on the motion to dismiss. At the dismissal hearing, the trial court heard testimony from Detective Christina Cottom of the Cleveland Police Department ("CPD"), Sex Crimes Unit.

{¶4} Det. Cottom testified that on June 14, 2000, the CPD received information relating to the sexual assault of the victim, L.G. Based on the sexual assault complaint, officers went to MetroHealth Medical Center ("MetroHealth") where L.G. was being

treated. Significantly, Det. Cottom confirmed that L.G.'s medical records and the rape kit were still in evidence and available for trial.

{¶5} Det. Cottom testified that the original detective assigned to investigate the sexual assault was Detective Nate Pursley. According to Det. Pursley's notes, he left phone messages for L.G. to call him on June 21, 2000, and July 3, 2000. Additionally, Det. Pursley sent a letter to L.G. on July 13, 2000, asking her to contact him immediately. On August 23, 2000, Det. Pursley contacted L.G., and she stated that she did not wish to prosecute at that time. Det. Cottom explained that CPD has a policy whereby they do not proceed with a prosecution for sexual assault without the cooperation of the alleged victim.

{¶6} On August 17, 2004, the CPD was notified by the Ohio Bureau of Criminal Identification and Investigation ("BCI") of a hit in the Combined DNA Index System ("CODIS") matching appellant's DNA to the DNA swabs taken from L.G. on the night of the incident. Based on this new information, Det. Pursley reopened his investigation on October 18, 2004. On October 28, 2004, and October 29, 2004, officers left unreturned phone messages for L.G. On November 3, 2004, a certified letter was sent to L.G.'s home, which was not returned to the Cleveland Police Department.

{¶7} Det. Cottom testified that she became involved with the investigation on January 4, 2006. Between January 5, 2006, and December 27, 2012, the CPD did not have any contact with L.G. However, on December 11, 2012, CPD received a second CODIS hit letter from BCI. On December 13, 2012, BCI confirmed that the 2000 rape

kit from L.G. contained appellant's DNA. On December 27, 2012, Det. Cottom contacted L.G. and obtained her desire to proceed with the prosecution of appellant.

{¶8} On January 2, 2013, Det. Cottom interviewed appellant regarding the June 14, 2000 incident. During the interview, appellant stated that he could not remember the time frame at issue. Appellant also denied knowing anyone who worked at Six Flags Amusement Park.

{¶9} On May 2, 2013, the trial court denied appellant's motion to dismiss, finding that appellant failed to establish that he was substantially prejudiced by the preindictment delay.

{¶10} The matter proceeded to a jury trial on August 20, 2013, where the following testimony was presented.

{¶11} L.G. testified that at the time of trial she was 31 years old. In the summer of 2000 when she was 19 years old, she worked at Six Flags Amusement Park in Aurora, Ohio. At the time she worked at Six Flags, she lived near the intersection of East 110 Street and Union Avenue in Cleveland, Ohio. She commuted to her job by walking approximately 15 minutes to Martin Luther King Boulevard and taking a bus to Six Flags. L.G. testified that the entire commute from her home to work took approximately one and one-half hours.

{¶12} On June 14, 2000, L.G. finished her shift at work and was returning home on the same route she took each day. She testified that while she was walking home, she took off her Six Flags work shirt and carried it over her shoulder because it was a hot

night. As she walked, someone ran down from one of the houses, took her shirt from her, ran back up to his porch, and stated, "if you want your shirt back, you gotta come up here and get it." She recalled that it was a red brick house with a plastic couch on the front porch.

{¶13} L.G. testified that there were three men on the front porch, including the man who took her shirt. When she went up to the porch to retrieve her shirt, the three men forced her to the couch, and two of the men held her arms and legs while the man who initially took her shirt pulled her pants and panties down and inserted his penis into her vagina. L.G. stated that she repeatedly told him to stop and to let her go. According to L.G., the incident concluded when the man ejaculated.

{¶14} When appellant let her go, L.G. immediately ran home and told her mother what had occurred. Her mother took her to MetroHealth that same night, and a rape kit examination was done. L.G. testified that she provided the nurses and responding CPD officers with the same details of the incident as she testified to at trial. However, on cross-examination, L.G. admitted that she did not tell the nurses or responding officers about the two unidentified men who held her down while appellant raped her. L.G. testified that she did not mention the two men "because at the time it was not important." Furthermore, L.G. stated that she did not cooperate in the prosecution of her sexual assault or follow up with the CPD after her initial interview because she was "afraid" and "wanted to put [the incident] behind [her]."

**{¶15}** L.G. testified that she did not speak with anyone from the CPD again until Det. Cottom contacted her in 2012. During her interview with Det. Cottom, L.G. identified appellant in a photo lineup as her assailant. Finally, L.G. identified appellant in court as the person who sexually assaulted her.

**{¶16}** Kimberly Spohn testified that, at the time of the trial, she was a registered nurse who worked as a case manager in the emergency department at MetroHealth. Spohn stated that she treated L.G. in the emergency department at MetroHealth on June 14, 2000. She identified state's exhibit No. 11 as the complete medical record of L.G.'s visit to the hospital and stated that she performed L.G.'s rape kit examination. According to Spohn, L.G. stated that she was on her way home from work when a person known to her called her up to his porch and then forced her down, "pulled her pants off and put his penis into her vagina." Spohn testified that L.G.'s demeanor was flat, and she was very soft spoken and would not make eye contact. Spohn found no external indication of any injury and no bruising, redness, or markings on her wrists or ankles.

**{¶17}** Erica Jimenez testified that she is a DNA analysis at BCI. She confirmed that the vaginal swab taken from L.G. during the rape kit examination tested positive for semen. The semen was found to be consistent with appellant's DNA.

**{¶18}** Det. Cottom testified that she inherited the investigation into the sexual assault of L.G. after the original detectives left the sex crimes unit. She testified that she contacted L.G. in December 2012 and conducted an interview on December 26, 2012. Det. Cottom testified that L.G. provided her with a detailed statement that was consistent

with her testimony at trial. However, Det. Cottom admitted that she was not aware that L.G. did not include the unidentified males who held her down in her initial statement to the responding officers and medical staff.

{¶19} At the close of the state's case, defense counsel moved for judgment of acquittal, which was granted as to Count 4, kidnapping for the purpose of terrorizing or inflicting serious physical harm, and denied as to the remaining counts. The defense rested without calling any witnesses.

{¶20} At the conclusion of trial, the jury found appellant guilty of Counts 1 and 2, rape and gross sexual imposition. However, the jury was unable to reach a verdict on the remaining kidnapping charge in the third count. On September 4, 2013, the trial court granted the state's motion to dismiss Count 3 and the sexually violent predator specifications attached to Counts 1 and 2.

{¶21} On September 11, 2013, the trial court held a sentencing hearing at which the state conceded that Counts 1 and 2 were allied offenses. The state elected to proceed to sentencing on the rape conviction. The trial court sentenced appellant to a ten-year term of imprisonment on Count 1 and ordered that sentence to run consecutively to a sentence of 7 years in Cuyahoga C.P. No. CR-569103, for a total of 17 years of imprisonment.

## II. Law and Analysis

### A. Preindictment Delay

**{¶22}** In his first assignment of error, appellant argues that the trial court committed reversible error when it denied his pretrial motion to dismiss the indictment due to preindictment delay.

**{¶23}** A trial court's decision on a motion to dismiss for preindictment delay is reviewed de novo with respect to the legal issues, but the findings of fact made by the trial judge are afforded great deference on appeal. *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 45.

**{¶24}** A defendant's due process rights can be violated by preindictment delay under certain circumstances. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). "An unjustifiable delay between the commission of an offense and a defendant's indictment therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law * * *." *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus.

**{¶25}** Courts apply a two-part test to determine whether preindictment delay constitutes a due process violation. The defendant has the initial burden to show that he was substantially and actually prejudiced due to the delay. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998); *State v. Kemp*, 8th Dist. Cuyahoga No. 97913, 2013-Ohio-167, ¶ 28. The burden then shifts to the state to produce evidence of a justifiable reason for the delay. *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829. Thereafter, the due process inquiry involves a balancing test by the court,

weighing the reasons for the delay against the prejudice to the defendant, in light of the length of the delay. *Id*. at ¶ 51.

{¶26} In reviewing preindictment delay, the determination of actual or substantial prejudice entails "a delicate judgment based on the circumstances of each case." *Id*. at ¶ 52. The court must consider "the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Id*. Prejudice is not presumed solely due to a lengthy delay. *State v. Copeland*, 8th Dist. Cuyahoga No. 89455, 2008-Ohio-234, ¶ 13. Similarly, a general assertion that the defendant cannot remember the events of the alleged crime does not constitute actual prejudice. *State v. Glasper*, 2d Dist. Montgomery No. 15740, 1997 Ohio App. LEXIS 583 (Feb. 21, 1997). Furthermore, the defendant may not rely on speculation or vague assertions of prejudice. *State v. Clemons*, 2013-Ohio-5131, 2 N.E.3d 930, ¶ 17. Rather, "proof of actual prejudice must be specific, particularized and non-speculative." *State v. Stricker*, 10th Dist. Franklin No. 03AP-746, 2004-Ohio-3557, ¶ 36. The defendant must show the exculpatory value of the alleged missing evidence to prove substantial prejudice. *Copeland* at ¶ 13. In other words, a defendant must show how lost witnesses and physical evidence would have proven the defendant's asserted defense. *State v. Davis*, 7th Dist. Mahoning No. 05 MA 235, 2007-Ohio-7216, ¶ 17 ("Without proof of prejudice, meaning something which adversely affects [a defendant's] ability to defend himself at trial, there is no due process violation for preindictment delay in prosecution").

**{¶27}** In the case at hand, appellant argues that there are "three witnesses or groups of witnesses" in this case that "could have provided evidence helpful to appellant's [defense]," namely, the police officers who interviewed L.G. at MetroHealth, the two males who L.G. alleged held her down during the sexual assault, and L.G.'s mother. Specifically appellant contends that the police officers may have established the inconsistent nature of L.G.'s version of events; that the unidentified males may have corroborated that any sexual conduct was consensual; and that L.G.'s mother may have provided a basis for why L.G. may have had a motive to lie about the alleged sexual conduct.

**{¶28}** To establish a claim of prejudice due to the unavailability of witnesses who would be able to testify on a defendant's behalf, the defendant must: (1) identify the missing witnesses and the subject matter of their testimony; and (2) explain how the missing evidence has impaired his defense. *State v. Zich*, 6th Dist. Lucas No. L-09-1184, 2011-Ohio-6505, ¶ 84, citing *State v. Robinson*, 6th Dist. Lucas No. L-06-1182, 2008-Ohio-3498, ¶ 126. Mere speculation on these factors will not suffice. *See State v. Gulley*, 12th Dist. Clinton No. CA99-02-004, 1999 Ohio App. LEXIS 6091 (Dec. 20, 1999).

**{¶29}** Initially, we note that appellant was not prejudiced by the unavailability of the responding officers' testimony because L.G. openly admitted that she did not include the two unidentified males who held her down in her initial statement to the officers on June 14, 2000. Thus, the jury was presented with evidence that L.G.'s version of the

events at trial was inconsistent with the information she provided to the reporting officers on the night of the incident. The jury was also provided with L.G.'s explanation for why she did not include the unidentified males in her statement to the officers, and the jury was able to weigh this information when reaching its verdict. Accordingly, appellant was not prejudiced by the inability to call the reporting officers as witnesses at trial.

{¶30} Moreover, in our view, appellant's arguments relating to the potential exculpatory value of the testimony from L.G.'s mother and the two unidentified males relies on mere speculation as to what they may have stated under oath. Appellant has provided no concrete proof that the identity of the two unknown males would have been established had there been no delay in the prosecution or that their testimony would have corroborated appellant's version of the events. Finally, with respect to appellant's argument that testimony from L.G.'s mother may have established L.G.'s motive to lie about the sexual assault, we note that such motives were explored by defense counsel during the cross-examination of L.G., but were ultimately rejected by the jury. Any potential exculpatory testimony that may have been provided by L.G.'s mother is premised solely on speculation.

{¶31} Based on the foregoing, we find that appellant has failed to establish a violation of his due process rights. Appellant has not shown that the preindictment delay caused him actual prejudice; rather, his arguments are speculative in nature. Having determined that appellant failed to prove actual prejudice, it is not necessary to determine whether there were justifiable reasons for the delay.

**{¶32}** Accordingly, appellant's first assignment of error is overruled.

### B. Manifest Weight of the Evidence

**{¶33}** In his second assignment of error, appellant argues that his convictions for rape and gross sexual imposition were against the manifest weight of the evidence.

**{¶34}** Appellant was convicted of rape in violation of R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

**{¶35}** Appellant was further convicted of gross sexual imposition in violation of of R.C. 2907.05(A)(1), which provides that "[n]o person shall have sexual contact with another, not the spouse of the offender * * *when * * * [t]he offender purposely compels the other person * * * to submit by force or threat of force."

**{¶36}** In reviewing a challenge to the manifest weight of the evidence, the court, after reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

**{¶37}** Although appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *Thompkins* at 386.

**{¶38}** In challenging the weight of the evidence supporting his convictions, appellant essentially argues that L.G. was not a credible witness. We disagree.

**{¶39}** Initially, appellant contends that the credibility of L.G.'s accusations against him must be called into question where she, "by her own admission, did not want to submit to her mother's insistence that she go to the hospital after coming home from the alleged rape" and was initially uncooperative with CPD's prosecution of the case. Further, appellant submits that the medical records are completely inconsistent with her claim of being raped, particularly where the medical staff found no bruising, markings, or redness on her arms and legs and no external or internal indications of any injury to her sex organs.[1] Finally, appellant contends that L.G. should not be believed because she did

---

[1] This district has consistently held that a conviction for rape or gross sexual imposition does not require proof of trauma or physical injury. *See State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 and 100247, 2014-Ohio-2181, ¶ 44, citing *State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 46.

not mention the two other men involved in her rape to the medical staff or CPD officers on the night of the incident.

{¶40} After reviewing the entire record and weighing the evidence and all reasonable inferences, including the credibility of the witnesses, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. At trial, defense counsel extensively cross-examined L.G. about the reasons for her delayed cooperation with the CPD and her failure to mention the two unidentified men to nurse Spohn or the responding officers. Furthermore, nurse Spohn testified about the lack of physical injuries suffered by L.G., but explained that the existence or nonexistence of physical trauma to a victim is not dispositive of whether sexual conduct was consensual or nonconsensual. Thus, the jury was provided the opportunity to weigh defense counsel's challenges to L.G.'s credibility prior to reaching a verdict in this matter. The jury, as the trier of fact, was in the best position to weigh the credibility of L.G.'s testimony, and we cannot say the jury's resolution of the alleged inconsistencies in her testimony was unreasonable.

{¶41} Based on the foregoing, appellant's convictions were not against the manifest weight of the evidence.

{¶42} Appellant's second assignment of error is overruled.

{¶43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR